**Affirmed and Memorandum Opinion filed August 9, 2022.**



In The

# Fourteenth Court of Appeals

### NO. 14-22-00198-CV

## IN THE INTEREST OF M.T., A CHILD

**On Appeal from the 306th District Court
Galveston County, Texas
Trial Court Cause No. 20CP0017**

## M E M O R A N D U M   O P I N I O N

The trial court terminated Mother's parental rights to her four-year-old son, Matthew,[1] on five predicate grounds, including endangerment by conduct. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(E). The trial court also found that termination of Mother's parental rights was in Matthew's best interest and appointed the Department of Family and Protective Services (the "Department") as Matthew's sole managing conservator.

On appeal, Mother challenges the sufficiency of the evidence supporting the

---

[1] We use pseudonyms to refer to the child, parents, and other family members involved in this case. *See* Tex. Fam. Code Ann. § 109.002(d); Tex. R. App. P. 9.8(b)(2).

trial court's predicate findings, as well as its best-interest finding and appointment of the Department as managing conservator. Because we conclude sufficient evidence supports the trial court's endangering conduct and best-interest findings as well as its appointment of the Department as Matthew's managing conservator, we affirm the trial court's judgment.

## BACKGROUND

In February 2020, the Department filed an "Original Petition for Protection of a Child, For Conservatorship, and For Termination In Suit Affecting the Parent-Child Relationship," requesting the trial court (1) terminate Mother's and Father's parental rights with respect to Matthew, and (2) appoint the Department as Matthew's sole managing conservator. A bench trial was held approximately two years later.

## I. Evidence at Trial

Nine witnesses testified at the bench trial; we summarize the relevant portions of their testimony below.

### Erica Terrell

The first witness to testify was Erica Terrell, one of the Department caseworkers assigned to Matthew's case. Terrell said the case came to her attention in November 2019 when the Department received an intake referral alleging neglectful supervision of Matthew, who was two years old at the time.

Terrell testified that relatives of Matthew had expressed concerns about Mother's drug use. According to Terrell, Father also told her he "had concerns that [Mother] was back using drugs." Terrell said she repeatedly asked Mother to take a drug test but, during the course of Terrell's investigation, Mother failed to complete a test.

2

Admitted into evidence during Terrell's testimony was an indictment from July 2020 charging Mother with child endangerment. In relevant part, the indictment states:

> [Mother], on or about the 16th day of March, 2020 . . . did then and there intentionally, knowingly, recklessly, or with criminal negligence, engage in conduct that placed [Matthew], a child younger than 15 years of age, in imminent danger of death, bodily injury, or physical or mental impairment, by exposing [Matthew] to Oxycodone, Methamphetamine, and/or Amphetamine, and [Mother] did not voluntarily deliver the child to a designated emergency infant care provider under Section 262.302 of the Texas Family Code.

Also admitted into evidence was the attendant judgment convicting Mother of the felony offense of child endangerment. The judgment sentenced Mother to 12 months imprisonment in county jail.

Terrell testified that Matthew was subsequently removed from Mother's and Father's care and placed with his maternal grandmother ("Grandmother"). According to Terrell, she continued to facilitate parent-child visits between Mother and Matthew. However, during one of these visits, Terrell recalled that Mother "appeared to be under the influence of a substance. She was falling asleep, nodding off, slurring. I had to end the visit with [Mother] at that time."

### Dr. Patricia Beach

The second witness to testify was Dr. Patricia Beach, a pediatrician at the University of Texas Medical Branch. Dr. Beach said she is the hospital's chief pediatrician and works with children who are suspected victims of abuse and neglect.

Dr. Beach first examined Matthew in March 2020, shortly after he was placed in Grandmother's care. Reviewing the medical records from the visit, Dr. Beach stated that she noted the following in the "Problem List": neglect of child;

exposure to environmental methamphetamine and oxycodone; and exposure to methamphetamine. Dr. Beach also noted that Mother "has not complied with steps including drug testing."

In the "Assessment/Diagnoses" section of the medical records, Dr. Beach stated that Matthew "[h]as apparent delays in many areas, consistent with supervisory neglect. Neglect consistent with history of maternal drug use, though details not available." Dr. Beach recalled being concerned that Matthew had "severe constipation" and "was not doing the things that a child of his age should be able to do."

Dr. Beach's medical records also included information about Matthew's prior medical history. When Matthew was born, he "spent time in the NICU at Clear Lake RMC for NAS scoring." According to Dr. Beach, "NAS" stands for "[n]eonatal abstinence syndrome," which refers to "symptoms that a child would exhibit if [he] has been exposed to opiate drugs during pregnancy." The medical records also noted that Mother's and Matthew's post-birth urinalysis drug screens were negative. However, according to Dr. Beach, those results would "typically" cover only the two days prior to testing. Accordingly, the results "wouldn't be any indication one way or the other beyond those two days as to whether [Matthew] was exposed in utero to any substances."

Dr. Beach also reviewed notes from two of Matthew's prior hospital visits. The first visit was in October 2019, when Matthew was almost two years old. The notes state that Matthew was taken to the "pediatric clinic for hospital follow-up for a hairline fracture of the great toe secondary to a crush injury two weeks ago." The notes did not include any indication of how the injury occurred.

The second visit was in December 2019; the medical records state that Matthew "was hit by a board that fell while dad was changing a light. Immediate

bleeding and looked swollen." The notes were taken at 1:12 a.m. According to Dr. Beach, this incident was "concern[ing]" because it occurred "when people are usually sleeping."

Dr. Beach testified that, aside from these incidents, Matthew's other medical records did not include anything particularly concerning. Dr. Beach said that, in Matthew's most recent visit, "his developmental screening was normal." Dr. Beach said Matthew is "thriving" and "doing well." Dr. Beach did not have any concerns about Matthew remaining in Grandmother's care.

### Eric Kemmerer

Eric Kemmerer is a Department caseworker who was assigned to Matthew's case in March 2020. In this role, Kemmerer created a family service plan for Mother and Father. With respect to Mother, Kemmerer testified that the "biggest barrier to reunification" was "[s]ubstance abuse." Kemmerer said Mother did not drug test consistently and tested positive during the pendency of the investigation.

Admitted during this line of testimony were the results from a drug test Mother took in September 2021. The test shows that Mother tested positive for methamphetamine, marijuana metabolite, and oxycodone. Kemmerer testified that this positive test was "concern[ing] because it's nearly a year and a half into the conservatorship case."

Also admitted into evidence was a judgment of conviction from August 2021, which states that Mother was convicted of criminal trespass and sentenced to 108 days in county jail. According to Kemmerer, this conviction was in connection with an incident when Mother went "to [Grandmother's] residence without permission."

According to Kemmerer, Mother did not begin or complete the services

5

prescribed in the family service plan. Kemmerer said Mother did not indicate to him that she "wanted to complete any particular service but w[as] unable to for any reason." Kemmerer testified that Mother did not have any scheduled visitation with Matthew nor did she reach out to Kemmerer regarding visitation.

Kemmerer said the Department's goal was to have Matthew adopted by Grandmother. From the time he was removed from his parents' care and placed with Grandmother, Kemmerer described Matthew's changes as follows:

> When he went there, you know, he had some bad teeth. He wasn't eating very well. He wasn't talking very much. And over the course of time, he really opened up. He had a dental done. He had five teeth extracted. He's eating better. He seems more open, more — it seems like he enjoys life better to be quite honest.

When asked whether he thought Matthew's needs were met by Grandmother, Kemmerer responded, "100 percent, absolutely."

### Alma Garcia

Alma Garcia provides counseling services through Comprehensive Treatment Solutions. Garcia said she received two referrals from the Department to initiate services for Mother. Garcia said she received the first referral in 2020 and made "[a]t least two or three" attempts to reach Mother. Garcia was not able to reach Mother and discharged Mother from services in 2020.

Garcia received the second referral in 2021 and again made "two or three" attempts to reach Mother. Garcia said she recalled leaving Mother voice mail messages. Mother did not return Garcia's calls and Garcia again discharged Mother from services.

### Grandmother

Grandmother said Matthew has lived with her since March 2020. When

Matthew first came to live with her, Grandmother recalled that he was underweight, would not eat, and had bad teeth. Grandmother said Matthew also was "withdrawn," "didn't talk," and was "behind in his development."

Since he has lived with her, Grandmother said Matthew has made significant progress. Grandmother testified that he is learning to talk and write and has been doing "wonderful" in daycare. Overall, Grandmother said Matthew is doing "fantastic" and that she would like to adopt him.

According to Grandmother, if Matthew was returned to Mother's care it would delay the progress he has made over the last two years. Grandmother testified that Mother has used drugs "since [Matthew] was born and a child shouldn't be raised in basically a drug home." Grandmother also recounted incidents when Mother would "stalk[]" Grandmother and Matthew and "call the police on us, for welfare checks." According to Grandmother, when Mother "gets out of control" she is "kind of violent."

Grandmother also discussed an incident when Mother "made a comment that she was speaking to dead people and that Shawn, her dead husband, had told her that she needed to kill [Matthew]." Grandmother said this statement made her concerned about Mother's mental health.

Grandmother said she also cares for Mother's 16-year-old daughter, who has lived with Grandmother since she was four years old. Grandmother said Mother has had "[v]ery little" contact with this child.

Grandmother agreed that "stable housing [has] been an issue for [Mother] in the past." Grandmother said Mother sometimes lives with a man who is "involved in drugs."

7

### Shequita Deadman

Shequita Deadman works for the Department and is the supervisor currently assigned to Matthew's case. According to Deadman, Mother has not "alleviated any of the Department's concerns as to why [Matthew] came into care." Specifically, Deadman pointed out that Mother "is currently incarcerated"; "not stable"; and "doesn't have housing [or] employment." Deadman said Mother most recently had been arrested in November 2021 for burglary of a habitation.

Deadman said Mother has not completed any of the prescribed services for reunification with Matthew. Deadman said the Department's goal is for Matthew to be adopted by Grandmother.

### Debbie Burkhalter

Debbie Burkhalter is a court-appointed special advocate and was assigned to Matthew's case in April 2020. Burkhalter said she has "seen quite a bit of progress" in Matthew in the two years since he was placed in Grandmother's care. Describing Matthew's current demeanor, Burkhalter said "he's more like a little boy. He's rambunctious. He laughs. He plays. He smiles. He's talking." Burkhalter recommended that Matthew be adopted by Grandmother.

Burkhalter said she would have "concerns" if Matthew was returned to Mother's care because, in her opinion, Mother and Father "haven't had enough sobriety under their belt[s]." According to Burkhalter, she did not feel "that either parent has managed to alleviate [her] concerns in any way about the things that happened to bring [Matthew] into CPS custody."

### Mother

Mother said that, when Matthew was born, neither she nor Matthew tested positive for drugs. Mother said Matthew lived with her until he was placed in

Grandmother's care when he was two years old.

Beginning in April 2020, Mother said she spent approximately 11 months in jail for felony endangerment of Matthew. Mother said she currently has been back in jail for approximately three months for burglary of a habitation.

Mother said a Department caseworker has visited her only once since Matthew was placed in Grandmother's care. Mother said the Department did not send anyone to visit her while she was in jail. According to Mother, she has completed paperwork relating to her service plan and sent it to the Department, but she has not heard back from anyone. Mother also said she did not receive a family service plan from a caseworker; rather, she had to obtain one for herself at the courthouse.

Mother said she has five other children aside from Matthew. According to Mother, none of the children live with her but she has not had her parental rights terminated with respect to any of them. Mother said she currently lives with a roommate at a house in Bacliff, Texas. Mother said she was not present at the house in October 2019 when it was raided for drugs.

Mother said the last time she used methamphetamine was prior to Matthew's birth. When asked about the September 2021 drug test results that showed she tested positive for methamphetamine, Mother continued to state she had not used methamphetamines since before Matthew's birth.

## II.  Trial Court's Findings

The trial court signed an "Order of Termination" on February 27, 2022, terminating Mother's and Father's parental rights with respect to Matthew.

In its order, the trial court found that termination of Mother's parental rights was in Matthew's best interest and warranted under five subsections of section

161.001(b)(1) of the Texas Family Code: (D) (endangerment by environment), (E) (endangerment by conduct), (L) (parent found criminally responsible for the death or serious injury of a child), (O) (failure to comply with a court-ordered plan for reunification with the child), and (P) (used controlled substance in a manner that endangered the child's health or safety). *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E), (L), (O), (P).

The trial court also appointed the Department as Matthew's sole managing conservator. Mother timely appealed.[2]

ANALYSIS

Mother raises two issues on appeal and challenges: (1) the sufficiency of the evidence supporting the trial court's predicate findings under section 161.001(b)(1) and best-interest finding; and (2) the trial court's appointment of the Department as Matthew's sole managing conservator.

We begin with the applicable burdens of proof and standards of review before turning to Mother's first issue.

## I. Burdens of Proof and Standards of Review

Involuntary termination of parental rights is a serious matter that implicates fundamental constitutional rights. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985); *In re J.E.M.M.*, 532 S.W.3d 874, 879 (Tex. App.—Houston [14th Dist.] 2017, no pet.). But although parental rights are of constitutional magnitude, they are not absolute. *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002). Given the fundamental liberty interests at stake, "termination proceedings should be strictly scrutinized, and involuntary termination statutes are strictly construed in favor of the parent." *Holick*, 685 S.W.2d at 20.

---

[2] Father did not file a notice of appeal in the underlying proceeding.

Parental rights may be terminated if clear and convincing evidence shows (1) the parent committed an act described in section 161.001(b)(1) of the Texas Family Code, and (2) termination is in the child's best interest. *See* Tex. Fam. Code Ann. § 161.001(b)(1), (2). "'Clear and convincing evidence' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id*. § 101.007.

This heightened burden of proof results in heightened standards of review for evidentiary sufficiency. *In re V.A.*, 598 S.W.3d 317, 327 (Tex. App.—Houston [14th Dist.] 2020, pet. denied). For a legal sufficiency challenge, we consider all the evidence in the light most favorable to the finding to determine whether a reasonable fact finder could have formed a firm belief or conviction that its finding was true. *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). We assume that the fact finder resolved disputed facts in favor of its finding if a reasonable fact finder could do so, and we disregard all controverting evidence a reasonable fact finder could disbelieve. *Id*.

For a factual sufficiency challenge, we consider and weigh all the evidence, including disputed or conflicting evidence, to determine whether a reasonable fact finder could have formed a firm belief or conviction that its finding was true. *In re C.H.*, 89 S.W.3d at 25. We examine whether disputed evidence is such that a reasonable fact finder could not have resolved that dispute in favor of its finding. *Id*.

The fact finder is the sole arbiter when assessing the credibility and demeanor of witnesses. *In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014). "We may not second-guess the fact finder's resolution of a factual dispute by relying on disputed evidence or evidence the fact finder 'could easily have rejected as not

credible.'" *In re V.A.*, 598 S.W.3d at 328 (quoting *In re L.M.I.*, 119 S.W.3d 707, 712 (Tex. 2003)).

## II. Predicate Termination Findings

Mother asserts the evidence is legally and factually insufficient to support the trial court's finding that termination was warranted under five subsections of section 161.001(b)(1) of the Texas Family Code. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E), (L), (O), (P).

### A. Governing Law

"To affirm a termination judgment on appeal, a court need uphold only one termination ground — in addition to upholding a challenged best-interest finding — even if the trial court based the termination on more than one ground." *In re N.G.*, 577 S.W.3d 230, 232 (Tex. 2019) (per curiam). Predicate findings under subsections (D) and (E), however, pose significant collateral consequences. *See id.* at 234, 235 (discussing section 161.001(b)(1)(M), which provides that a court may terminate a parent's rights if it finds, by clear and convincing evidence, that the parent has had his "parent-child relationship terminated with respect to another child based on a finding that the parent's conduct was in violation of Paragraph (D) or (E)"). In light of these consequences, we are required to consider the sufficiency of the evidence pursuant to subsections (D) and (E) when raised on appeal. *Id.* at 235; *see also, e.g., In re P.W.*, 579 S.W.3d 713, 721, 728 (Tex. App.—Houston [14th Dist.] 2019, no pet.).

Our analysis begins with the trial court's finding that termination is warranted under subsection (E).

Subsection (E) authorizes termination if the parent "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers

the physical or emotional well-being of the child." Tex. Fam. Code Ann. § 161.001(b)(1)(E). In this context, "endanger" means "to expose to loss or injury; to jeopardize." *In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996) (per curiam); *see also In re S.R.*, 452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). Endangerment encompasses "more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment"; therefore, it is not necessary that the conduct was directed at the child or that the child suffered actual injury. *In re M.C.*, 917 S.W.2d at 269.

Under subsection (E), the relevant inquiry is whether evidence exists that the endangerment of the child's physical and emotional well-being was the direct result of the parent's conduct, including acts, omissions, or failures to act. *In re S.R.*, 452 S.W.3d at 360. Although endangerment under this subsection often involves physical endangerment, the statute does not require that the conduct be directed at a child or that the child actually suffer physical injury; rather, the specific danger to the child's well-being may be inferred from the parent's misconduct alone. *Id.* "As a general rule, subjecting children to a life of uncertainty and instability endangers the children's physical and emotional well-being." *In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009).

But termination under subsection (E) must be based on more than a single act or omission — "the statute requires a voluntary, deliberate, and conscious course of conduct by the parent." *In re V.A.*, 598 S.W.3d at 331; *In re S.R.*, 452 S.W.3d at 360. For this inquiry, we may consider conduct occurring both before and after the child was removed from the parent's care. *In re S.R.*, 452 S.W.3d at 360.

Evidence of criminal conduct, convictions, imprisonment, and their effects on a parent's life and ability to parent may establish an endangering course of

conduct. *Id.* at 360-61. "Routinely subjecting children to the probability that they will be left alone because their parent is in jail endangers children's physical and emotional well-being." *In re J.B.*, No. 14-20-00766-CV, 2021 WL 1683942, at *5 (Tex. App.—Houston [14th Dist.] Apr. 29, 2021, pet. denied) (mem. op.).

### B. Application

Under the applicable standards of review, we conclude the evidence is legally and factually sufficient to support the trial court's finding that Mother endangered Matthew as described in subsection (E).

First, the evidence shows that Mother has a history of substance abuse that began before Matthew's birth in November 2017. Reviewing Matthew's medical records, Dr. Beach testified that Matthew spent time in the NICU shortly after birth for neonatal abstinence syndrome, which refers to the collection of symptoms a child exhibits if the child was exposed to opiate drugs in utero. *See In re M.J.*, No. 14-20-00449-CV, 2020 WL 7038526, at *6 (Tex. App.—Houston [14th Dist.] Dec. 1, 2020, no pet.) (mem. op.) ("a mother's drug abuse during pregnancy is particularly endangering to an unborn child's physical well-being").

Second, the evidence shows that Mother has repeatedly been incarcerated. *See In re S.R.*, 452 S.W.3d at 360-61. Beginning in April 2020, Mother said she spent approximately 11 months in jail for felony child endangerment. At the time of trial, Mother testified that she had been back in jail for about three months for burglary of a habitation. Mother also was convicted of criminal trespass in connection with an incident at Grandmother's residence and sentenced to 108 days in county jail. This evidence of repeated incarcerations supports the trial court's finding that Mother engaged in a pattern of conduct that endangered Matthew's well-being. *See In re J.B.*, 2021 WL 1683942, at *5; *In re S.R.*, 452 S.W.3d at 360-61.

Third, the evidence shows that Matthew sustained at least two serious injuries while in Mother's care. *See In re J.D.*, 436 S.W.3d 105, 114-15 (Tex. App.—Houston [14th Dist.] 2014, no pet.) (history of repeated injuries to a child may support a finding that the child's caregiver allowed the child to remain in surroundings that endangered his physical well-being). According to Matthew's medical records, he was taken to the hospital in October and December 2019. The first visit was a follow-up appointment "for a hairline fracture of the great toe secondary to a crush injury" that occurred two weeks prior. The records did not state how this "crush injury" occurred. The second visit sought treatment for Matthew after he was "hit by a board that fell while dad was changing a light." This visit took place in the early-morning hours which, according to Dr. Beach, was concerning because that is "when people are usually sleeping." These injuries, combined with the evidence of Mother's continuous substance abuse, support the finding that Mother engaged in a course of conduct that endangered Matthew's physical well-being.

Fourth, the evidence shows that Matthew was dealing with several health issues at the time he was placed in Grandmother's care. *See In re S.B.*, No. 12-12-00402-CV, 2013 WL 2286081, at *8 (Tex. App.—Tyler May 22, 2013, no pet.) (mem. op.) (evidence that the child was "in poor health" supported finding that the parents engaged in an endangering course of conduct). In Matthew's March 2020 medical records, Dr. Beach noted that Matthew "[h]as apparent delays in many areas, consistent with supervisory neglect," had "severe constipation," and "was not doing the things that a child of his age should be able to do." Similarly, caseworker Kemmerer said Matthew had "bad teeth," "wasn't eating very well," and "wasn't talking very much." Providing a similar account, Grandmother said Matthew "would not eat," "had bad teeth," and was "withdrawn" and "behind in

his development."

Finally, other incidents and circumstances described by the witnesses' testimony further support the finding that Mother engaged in an endangering course of conduct. According to caseworker Kemmerer, Mother did not begin or complete the services prescribed in the family service plan. *See In re S.R.*, 452 S.W.3d at 362 ("A parent's efforts to improve or enhance parenting skills are relevant in determining whether a parent's conduct results in endangerment under subsection E."). Similarly, Garcia testified that Mother did not respond to her numerous attempts to reach Mother regarding the initiation of her prescribed services.

Kemmerer was assigned to Matthew's case beginning in March 2020; according to Kemmerer, Mother had not contacted him about scheduling visitation with Matthew during this time. *See In re A.W.*, No. 14-20-00492-CV, 2020 WL 7068131, at *7 (Tex. App.—Houston [14th Dist.] Dec. 3, 2020, pet. denied) (mem. op.) (parent's inconsistent participation in visitation supports finding that parent endangered the child's emotional well-being). Describing one of Mother's earlier visits with Matthew, caseworker Terrell said Mother "appeared to be under the influence of a substance."

This evidence, considered together, would allow the fact finder to form a firm belief or conviction that Mother engaged in a course of conduct that endangered Matthew's physical or emotional well-being. *See* Tex. Fam. Code Ann. §§ 101.007, 161.001(b)(1)(E); *In re J.F.C.*, 96 S.W.3d at 266; *In re C.H.*, 89 S.W.3d at 25. Accordingly, the evidence is legally and factually sufficient to support termination of Mother's parental rights under subsection (E). *See* Tex. Fam. Code Ann. § 161.001(b)(1)(E). We overrule Mother's challenge to the trial court's subsection (E) finding.

16

Because we conclude the evidence is sufficient to support termination under subsection (E), we need not address the trial court's finding pursuant to subsection (D). *See, e.g.*, *In re P.W.*, 579 S.W.3d at 728. Likewise, we need not address Mother's challenges to the trial court's findings pursuant to subsections (L), (O), and (P). *See In re N.G.*, 577 S.W.3d at 232-33. We overrule Mother's first issue.

## III. Best-Interest Finding

Mother also challenges the legal and factual sufficiency of the evidence to support the trial court's finding that termination of her parental rights is in Matthew's best interest. *See* Tex. Fam. Code Ann. § 161.001(b)(2).

### A. Governing Law

The best-interest inquiry is child-centered and focuses on the child's well-being, safety, and development. *In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018). The fact finder may consider several factors to determine the child's best interest, including: (1) the desires of the child; (2) the present and future physical and emotional needs of the child; (3) the present and future emotional and physical danger to the child; (4) the parental abilities of the persons seeking custody; (5) the programs available to assist those persons seeking custody in promoting the best interest of the child; (6) the plans for the child by the individuals or agency seeking custody; (7) the stability of the home or proposed placement; (8) acts or omissions of the parent that may indicate the existing parent-child relationship is not appropriate; and (9) any excuse for the parent's acts or omissions. *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976); *In re E.R.W.*, 528 S.W.3d 251, 266 (Tex. App.—Houston [14th Dist.] 2017, no pet.); *see also* Tex. Fam. Code Ann. § 263.307(b) (listing factors to consider in evaluating parents' willingness and ability to provide a child with a safe environment).

17

Courts apply a strong presumption that the best interest of the child is served by keeping the child with the child's natural parents, and it is the Department's burden to rebut that presumption. *In re D.R.A.*, 374 S.W.3d 528, 531 (Tex. App.—Houston [14th Dist.] 2012, no pet.). Prompt and permanent placement in a safe environment also is presumed to be in the child's best interest. Tex. Fam. Code Ann. § 263.307(a). A finding in support of "best interest" does not require proof of any unique set of factors, nor does it limit proof to any specific factors. *See Holley*, 544 S.W.2d at 371-72.

## B.    Application

Guided by the *Holley* factors, we conclude that sufficient evidence supports the trial court's finding that termination of Mother's parental rights is in Matthew's best interest. *See id.*

***Matthew's desires and needs.*** Matthew was placed in Grandmother's care when he was two years old. Matthew was four years old at the time of trial.

When a child is too young to express his desires, the fact finder may consider that the child has bonded with his current placement, is well cared for by them, and has spent minimal time with a parent. *In re V.A.*, 598 S.W.3d at 333. The evidence shows that these conclusions may be drawn here. Numerous witnesses testified that Matthew's physical and emotional well-being have significantly improved since he has been in Grandmother's care. Describing Matthew's transition to living with Grandmother, caseworker Kemmerer said Matthew "seems like he enjoys life better to be quite honest." Similarly, Burkhalter testified that Matthew is "more like a little boy" and "laughs," "plays," and "smiles." Grandmother said Matthew is doing "fantastic" and that she would like to adopt him.

***Matthew's present and future physical and emotional needs.*** The evidence at trial suggests that Mother was not meeting Matthew's physical and emotional needs while he was in her care. According to Dr. Beach, when she first saw Matthew in March 2020 (shortly after he was placed in Grandmother's care), he had "delays in many areas, consistent with supervisory neglect" and "was not doing the things that a child of his age should be able to do." Caseworker Kemmerer testified that, at this time, Matthew "wasn't eating very well," "wasn't talking very much," and had "some bad teeth." Grandmother also described Matthew as "withdrawn" and "behind in his development."

These witnesses described the significant progress Matthew has made since he has been in Grandmother's care. Dr. Beach said Matthew is "thriving" and "doing well"; she also said he no longer exhibits the development delays he had in March 2020. Kemmerer said Matthew has "really opened up," is "eating better," and has had extensive dental work completed. This evidence suggests that Grandmother is meeting Matthew's physical and emotional needs.

***Present and future emotional and physical danger to Matthew.*** The evidence suggests that returning Matthew to Mother's care would endanger his physical and emotional health. As analyzed above with respect to the trial court's subsection (E) finding, the evidence supports the finding that Mother engaged in a course of conduct that endangered Matthew's physical or emotional well-being. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(E); *see also In re V.A.*, 598 S.W.3d at 333 ("Evidence supporting termination under the grounds listed in section 161.001(b)(1) can be considered in support of a finding that termination is in the child's best interest."). Further, the evidence does not show that Mother has completed any of the services prescribed in the family service plan or taken any other substantive steps to remedy the issues that posed a threat to Matthew's

19

physical and emotional health. Therefore, the trial court reasonably could conclude that this pattern of behavior would continue into the future. *See, e.g.*, *In re J.T.W.P.*, No. 01-18-01084-CV, 2019 WL 2220114, at *5 (Tex. App.—Houston [1st Dist.] May 23, 2019, pet. denied) (mem. op.) ("without evidence of any significant change in her behavior, the trial court reasonably could infer that the mother was likely to continue using drugs in the future").

***Plans for Matthew and stability of proposed placement.*** Several witnesses testified that it would be in Matthew's best interest if he is adopted by Grandmother. Kemmerer said Grandmother "100 percent" meets Matthew's needs and that the Department's goal is to have Grandmother adopt him. Burkhalter also recommended that Matthew be adopted by Grandmother. Likewise, Grandmother said Matthew is doing well in daycare and that she would like to adopt him.

In contrast, the evidence does not suggest that Mother could provide a stable home for Matthew. Mother has a history of substance abuse and has been incarcerated at least three times in the last four years, including at the time of trial. According to Grandmother, if Matthew was returned to Mother's care, it would jeopardize the progress he has made over the past two years.

***Excuses for Mother's acts and omissions.*** The record does not contain any evidence of factors that mitigate Mother's acts and omissions with respect to Matthew's care. Department supervisor Deadman said Mother has not completed any of the services prescribed in her family care plan and has not "alleviated any of the Department's concerns as to why [Matthew] came into care." Garcia said she had made several attempts to reach Mother regarding her service referrals but Mother did not return her calls. Kemmerer said Mother did not indicate to him that she "wanted to complete any particular service but w[as] unable to for any reason" nor did she reach out to him to schedule visits with Matthew.

20

***Conclusion***.  Based on this evidence, a reasonable fact finder could have formed a firm belief or conviction that termination of Mother's parental rights was in Matthew's best interest.  *See* Tex. Fam. Code Ann. §§ 101.007, 161.001(b)(2).  We overrule Mother's challenge to the trial court's best interest finding.

## IV.    Sole Managing Conservatorship

In her second issue, Mother asserts the trial court abused its discretion by appointing the Department as Matthew's sole managing conservator.

We review a trial court's appointment of a non-parent as sole managing conservator for an abuse of discretion and reverse only if we determine that the appointment is arbitrary or unreasonable.  *In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007).

A parent shall be named a child's managing conservator unless the court finds that such appointment would significantly impair the child's physical health or emotional development.  *See* Tex. Fam. Code Ann. § 153.131(a).  The trial court made this finding in the underlying proceeding.

But when, as here, the parents' rights are terminated, section 161.207 controls the appointment of a managing conservator.  *See* Tex. Fam. Code Ann. § 161.207(a); *In re I.L.G.*, 531 S.W.3d 346, 356-57 (Tex. App.—Houston [14th Dist.] 2017, pet. denied).  Section 161.207 states, "[i]f the court terminates the parent-child relationship with respect to both parents or to the only living parent, the court shall appoint a suitable, competent adult, the [Department], or a licensed child-placing agency as managing conservator of the child."  Tex. Fam. Code Ann. § 161.207(a).  Having terminated both parents' rights, the trial court was required to appoint the Department or another permissible adult or agency as Matthew's managing conservator.  *See In re I.L.G.*, 531 S.W.3d at 357.  "The appointment

may be considered a 'consequence of termination.'" *Id.* (quoting *In re L.G.R.*, 498 S.W.3d 195, 207 (Tex. App.—Houston [14th Dist.] 2016, pet. denied)).

Having found the evidence sufficient to support the trial court's subsection (E) and best-interest findings, we conclude the trial court had sufficient information upon which to exercise its discretion and that it did not abuse its discretion in appointing the Department as Matthew's sole managing conservator. *See In re L.G.R.*, 498 S.W.3d at 207 (finding no abuse of discretion in conservatorship finding where the evidence was sufficient to support termination of parental rights).

We overrule Mother's challenge to the trial court's appointment of the Department as Matthew's sole managing conservator.

## CONCLUSION

We conclude that legally and factually sufficient evidence supports the trial court's section 161.001(b)(1)(E) and best-interest findings. We also conclude that the trial court's appointment of the Department as Matthew's sole managing conservator does not constitute an abuse of discretion. Therefore, we overrule Mother's issues on appeal and affirm the trial court's February 27, 2022 "Order of Termination."


/s/      Meagan Hassan
Justice


Panel consists of Justices Bourliot, Hassan, and Wilson.

22